Filed 6/18/15  P.A. v. Super. Ct. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| P.A. et al., | |
|     Petitioners, | E062965 |
| v. | (Super.Ct.No. J249334) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
|     Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
|     Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petitions for extraordinary writ.  Lynn M. Poncin, Judge.  Petitions denied.

Law Office of Dennis Moore and Dennis Howard Moore for Petitioner P.A.

Harold Gun Lai, Jr., for Petitioner S.P.

No appearance for Respondent.

1

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Real Party in Interest.

Petitioner P.A. (father) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452 (rule 8.452), challenging the juvenile court's order terminating reunification services as to his child. N.A. (the child) and setting a Welfare and Institutions Code[1] section 366.26 hearing. Father contends there was insufficient evidence to support the court's finding that it would be detrimental to return the child to his custody at the 18-month review hearing. Petitioner S.P. (mother) filed a separate rule 8.452 writ petition also arguing that the evidence was insufficient to show detriment. We deny the writ petitions.

FACTUAL AND PROCEDURAL BACKGROUND[2]

On May 7, 2013, San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the child, who was two years old at the time. The petition alleged that the child came within provisions of section 300, subdivisions (b) (failure to protect), (g) (failure to support), and (j) (abuse of sibling). The petition included the allegations that both father and mother (the parents) had a history of substance abuse, they failed to provide adequate housing, food, and clothing for the child,

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] Father previously filed a Notice of Intent to File a Writ Petition, following a jurisdiction/disposition hearing in July 2013 (case No. E059195). However, this court dismissed the petition, pursuant to a letter by father's counsel. We take judicial notice of the record in case No. E059195. (Evid. Code, § 452, subd. (d).)

2

they were both incarcerated for violating Penal Code section 273a, subdivision (b) (willful cruelty to a child), and their parental rights were terminated on four of their other children.

The social worker filed a detention report and stated that CFS received a referral when the parents were arrested and charged with willful cruelty to a child. (Pen. Code, § 273a, subd. (b).) A police officer reported that he found the parents' home to be filthy. There were shards of glass on the floor, while the child was barefoot; a dirty diaper on the floor at the entry of the residence; food on the floor; black mold on the ceiling; and clothing, trash, debris, and live and dead cockroaches all over the home. Both parents appeared to be under the influence of substances when the police came to the residence. The social worker further reported that the parents had an extensive history of caretaker absence and general neglect as to their four other children. Substantiated allegations included that there were live and dead cockroaches, no utilities, and no provisions of support. Moreover, the parents used marijuana and three of their children were born drug-exposed.

The court held a detention hearing on May 8, 2013, and detained the child in foster care.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report dated May 30, 2013, and recommended that the court declare the child a dependent of the court and that no reunification services be provided pursuant to section 361.5, subdivision (b)(10) and (11). The parents had previously had three of their children removed from their custody in

3

February 2009, due to unsafe and unsanitary living conditions at their home. The next month, mother was under the influence of alcohol, drugs, and/or narcotics, which resulted in an emergency Caesarian section, placing their fourth child at risk for birth defects. That child was taken into protective custody. The parents failed to follow through with their case plan, and reunification services were terminated in October 2009. Their parental rights as to these four children were terminated on February 19, 2010. The children were subsequently adopted. Furthermore, the child in the instant case was previously removed from the parents' custody in 2010, due to their history of substance abuse. No reunification services were ordered. However, the court later granted mother's section 388 petition and ordered reunification services. The parents reunified with the child on February 27, 2012. The current social worker noted that the parents failed to benefit from the services they participated in, since the child was now removed from them again for the same circumstances under which her siblings were removed.

On June 3, 2013, the child was diagnosed by a nurse practitioner with post traumatic stress disorder (PTSD) and anxiety "brought on by her [b]iological dysfunctional family unit." The nurse practitioner recommended that there be no visitation between the parents and the child. The court thus ordered visitation between the parents and the child to be suspended due to it being detrimental to the child at that time.

A contested jurisdiction/disposition hearing was held on July 19, 2013. The court declared the child a dependent, removed her from the parents' custody, and placed her in the care of CFS. The court ordered that no reunification services be provided to the

4

parents.  The court ordered visitation to remain suspended pending further information about the child's PTSD.  The court also set a section 366.26 hearing for November 18, 2013.

The court's minute order dated August 8, 2013, indicates a doctor signed a diagnosis for PTSD for the child.  She was referred to receive Screening, Assessment, Referral and Treatment (SART) services.

*Section 388 Petitions*

On October 17, 2013, and November 19, 2013, respectively, mother and father filed separate section 388 petitions, asking for the court to provide them with reunification services and visitation.  Both parents had participated in substance abuse treatment, a parenting class, and counseling on their own.  CFS opposed the petitions.  The court vacated the section 366.26 hearing that was set for November 18, 2013, and continued the matter to November 26, 2013, for a contested section 366.26/388 hearing.

*Section 366.26 Report*

On November 19, 2013, the social worker filed a section 366.26 report recommending that parental rights be terminated and that the permanent plan of adoption be implemented.  The social worker reported that on May 23, 2013 (before the court had suspended visitation), the child had a visit with the parents at the CFS office.  The child cried, screamed, and shook when she saw the parents.  When they attempted to take her into the playroom, the child repeatedly said, "I can't.  I can't."  The visit was ended due to the child's reluctance and unwillingness to interact with the parents.  It was after that

5

visit that the child was diagnosed with anxiety and PTSD and the court suspended the parents' visitation.

The social worker further opined that the child was appropriate to be adopted. She had been living with her foster parents/prospective adoptive parents (maternal relatives) since May 29, 2013. They had adopted the child's four older siblings and were eager to adopt her, as well. The child felt a healthy attachment to them, and they felt that she was already a part of their family. The prospective adoptive parents reported that the child referred to the parents as "[t]hat boy and girl." In April 2014, on the way to a visit, the child said she did not want to go. She would randomly say that she did not want to leave her family (referring to her foster family), and that she wanted to stay with her brothers and sisters and her family.

*Section 366.26/388 Hearing*

On November 26, 2013, the court held a contested section 366.26/388 hearing. After some testimony, the matter was continued to December 4, 2013. The court granted the petitions and ordered reunification services for the parents. The court stated that all prior orders not in conflict with this order would remain in effect and then set a 12-month review hearing for June 4, 2014.

*De Facto Parent Request and Interim Report*

On January 3, 2014, the foster parents filed a request for the court to deem them the child's de facto parents.

The social worker filed additional information to the court. A letter from an intervention specialist and behavioral health counselor supervisor at the Desert Mountain

6

Children's Center, where the child was receiving SART services, stated that the child appeared to be anxious and tense, difficult to engage, and anxious about separation from her foster parents and siblings. She went to the foster parents for comfort and affection. The intervention specialist noted that the child had several symptoms consistent with anxiety and/or previous trauma. She was very sensitive to changes in her environment. The intervention specialist opined that the child needed a stable placement and a consistent daily routine with a lot of structure. The social worker also attached a letter from a behavioral health specialist, dated January 21, 2014, which reported that the child had nightly episodes of crying and screaming in her sleep, that she screamed and refused to visit with the parents, that she would cling to the foster parents during social worker visits, and that she stated she did not want contact with the parents. The child had difficulty separating from the foster parents when she was left at preschool, and she had a fear of being abandoned there.

On January 22, 2014, at an appearance review hearing, the court granted the foster parents' request for de facto parent status. The court also ordered supervised visits to occur once a week, and gave the social worker the authority to terminate visits if the child had a "meltdown."

*Twelve-month Status Review*

The social worker filed a 12-month status review report on June 3, 2014, recommending that the parents continue to be provided with services. The social worker reported that the child did not have visits with the parents for a period of about eight months. After the court ordered visits to resume, the child had her initial visit on January

7

29, 2014, and felt nervous. When the foster father put the child down, she grabbed the social worker's hand. Upon walking into the visitation room, the parents sat at the table, but the child did not want to sit with them. The social worker sat at the table, and the child sat in her lap, facing her. The child hugged the social worker for five minutes.

The social worker supervised another visit on February 12, 2014. The foster father brought the child to the visit. After a while, the child asked the social worker if she could go with her "daddy." Father said, "That's not your daddy. I'm your daddy." The child stated, "No."

The social worker reported that the child was diagnosed with Anxiety Disorder Not Otherwise Specified, and that she was currently receiving weekly therapy services with her therapist, Gelcie Hitchman. The therapist reported seeing an increase in the child's stress since visits had resumed. She was unable to soothe herself, and the therapist was concerned that such inability would impact her self-esteem. The therapist further reported that the first week of visits, the child said, "I don't want to go there. I don't want to go see those people." The child constantly told her she did not want to go to visits. The therapist later reported that the child had incidents of masturbation, used as a form of self-soothing. The foster parents also reported that visits were difficult for the child, that she was very withdrawn after visits, and that she was "very clingy" for about two days afterward. They also reported that when preparing for visits, the child states, "I don't wanna go. I don't wanna go." On April 28, 2014, the social worker talked to the child about visits, and the child stated, "I don't want to go to my visits. I feel sad. I go home. I feel happy." On May 7, 2014, the child again said she did not want to go to

visits. The child's visitation coach, Annie, who monitored visits, reported that the child did not seem bonded with the parents, but rather saw them as playmates. A SART treatment progress report stated that visits with the parents were detrimental to the child, as evidenced by her behavior after visits. She had difficulty sleeping, a loss of appetite, nightmares, crying, she was clingy with the foster parents, and she became anxious when left alone.

The court held a 12-month status review hearing on June 4, 2014, and continued the child as a dependent. It found that there was a substantial probability the child could be returned to the parents within six months. The court ordered visitation to be a minimum of one time a week for one hour, in a therapeutic setting. It continued the matter to November 4, 2014, for an 18-month review.

On October 23, 2014, pursuant to a section 388 petition filed by father, the court increased the parents' visitation to two times a week, for two hours, supervised. One hour would be in a therapeutic setting and the other hour would be outside a therapeutic setting.

*Eighteen-month Status Review*

The social worker filed an 18-month status review report on October 24, 2014, recommending that the court find custody by the parents to be detrimental to the child and that the court terminate services. The parents remained unemployed, and they also remained on probation for willful cruelty to the child. The social worker reported that progress had been made in visitation, but it was slow. The child continued to say she did

9

not want to visit with the parents, even though she acted happy when she was with the parents.

At the 18-month review hearing on November 4, 2014, the parents requested a trial. The court set the matter for November 12, 2014, but it was later continued.

At a pretrial settlement conference on November 25, 2014, county counsel informed the court that a recent visit was reduced because of the child's unwillingness to visit. The child was seen at the Infinity Medical Group on November 14, 2014, and the nurse practitioner again noted her PTSD. The child had abdominal pain and was anxious due to her upcoming visit with the parents. The child stated to the nurse practitioner, "I'm never going to see them. I don't want them kissing me. They're not my parents." The nurse practitioner noted that the child was very reluctant to go to visits. The visits brought on severe anxiety attacks.

On December 30, 2014, the court held a contested hearing on visitation. The child's foster father testified that, during a four-month period of time (from February 2014 to June 2014), the child would wake up screaming, and repeatedly said she did not want to go to the visits. He testified that, just that month, the child told him more than once a day that she did not want to see the parents. The child also testified at the hearing. When asked what her parents' names were, she named the foster parents and said she lived with her mommy and daddy. When asked who she goes to visit, she named the parents by their first names. She said she liked going to visit them and said they played. At first, the child said she lived with her foster mother and father only, but upon more questioning, she said she also lived with her brothers and sisters. When asked if she

10

wanted to live with her sisters, she said yes. When asked if she wanted to live with father, she also said yes. The court maintained the current visitation order and continued the proceedings to January 14, 2015. At the January 14, 2015, hearing the court noted that the parties had a conference off the record and agreed that the testimony hearing in the contested visitation hearing could be considered for the contested 18-month review hearing.

The court continued with the hearing on February 9, 2015. The child's foster mother testified that, as recently as November 2014, the child was still refusing to go to visits. The current social worker on the case also testified. He stated that the child saw her foster parents as her parents. He opined that the child needed more time, perhaps one year, before she would feel comfortable enough with her biological parents to be able to spend the night with them. He testified that the child was clearly attached to the foster parents. He noted that when the child wanted help fixing her hair, she refused mother's help and requested for her foster mother to help her. The social worker opined that the child would not adjust well if she were to be sent home to live with the parents at that time. In light of her anxiety and tension from visits, he asserted that it "wouldn't be good for her" to be put in a place where she knew she was not going to return home to her foster family. He felt that it would be very traumatic for her. Noting that the parents were still having supervised visits, he stated that they would need to spend more time having her get used to being alone with the parents, starting with longer day visits, overnights, and weekends. He opined that it would take a lot of time for her to feel safe and comfortable. In addition, the counselor who completed a bonding assessment in June

11

2014 testified that the child and the parents were bonded. However, she also testified that the parents and the child needed more family therapy.

After hearing testimony and arguments from counsel, the court stated that it was looking at the emotional and psychological impact that return to the parents would have on the child. It noted the child's testimony that she liked to visit the parents and said they played together. She said she wanted to live with them, but also wanted to live with her sisters in her current home. The court noted that sometimes the child said she wanted to visit the parents and sometimes she did not. The court stated, however, that the child had clearly had stress and anxiety in her life as a result of the parents' actions. The court noted the evidence that the child had conflicted loyalty, in that she was attached to her foster parents, as well as the parents. The court concluded it could not say that the child could absolutely be returned home to the parents that day. The court stated its problem was that it could not order the child to be returned to the parents completely because there had been no unsupervised visits or anything to see if she could be transitioned home. County counsel stated that, at that point in the proceedings, the court could not order a transition home. The court had to set a section 366.26 hearing, but could make a visitation order for unsupervised visits. If those went well, the parents could file a section 388 petition. The court adopted the social worker's findings, terminated reunification services, set a section 366.26 hearing for June 25, 2014, and ordered unsupervised visitation until then to be a minimum of twice a week, with CFS having the authority to liberalize the visits. The court also set an appearance review hearing prior to the section 366.26 hearing.

ANALYSIS

The Court Properly Found That Return of the Child to the Parents Would Create a

Substantial Risk of Detriment

The parents argue that there was insufficient evidence of a substantial risk of detriment to the child if returned to their custody.  Father specifically contends that the evidence was insufficient because there were no psychological evaluations or opinions from the child's therapist that the child was at risk of suffering emotional harm if returned to the parents.  He further claims there was no evidence that return would cause "serious long term emotional damage."  Mother simply asserts that CFS did not meet its burden of showing detriment.  We disagree.

A.  *Relevant Law*

Section 366.22, subdivision (a), provides in relevant part:  "After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  The social worker shall have the burden of establishing that detriment."

"Appellate justices review a respondent court's decision after a section 366.22 ruling as follows:  'Evidence sufficient to support the court's finding "must be 'reasonable in nature, credible, and of solid value; it must actually be "*substantial*" proof of the essentials which the law requires in a particular case.'"  [Citation.]  "Where, as

13

here, a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" [Citations.]' [Citations.] In the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination. [Citations.]" (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 (*Constance K.*).)

B. *The Evidence Was Sufficient*

Here, the evidence clearly demonstrated that returning the child to the parents' custody would be detrimental to her. It showed that even supervised visits with the parents caused the child anxiety and stress. It also showed that the child was attached to the foster parents and her siblings, and that she would suffer if removed from their home. At the outset of the dependency, the child had a visit with the parents at the CFS office, and she cried, screamed, and shook when she saw them. When they attempted to take her into the playroom, she repeatedly said, "I can't. I can't." The visit was ended because of the child's reluctance and unwillingness to interact with the parents. After that visit, the child was diagnosed by a nurse practitioner with PTSD and anxiety, "brought on by her [b]iological dysfunctional family unit." The nurse practitioner recommended that there be no visitation between the parents and the child. Thus, the court ordered visitation between the parents and the child to be suspended due to it being detrimental to the child at that time. Furthermore, a letter from an intervention specialist and a behavioral health

14

counselor supervisor stated that the child appeared to be anxious and tense, difficult to engage, and anxious about separation from her foster parents and siblings. The intervention specialist noted that the child had several symptoms consistent with anxiety and/or previous trauma. She was very sensitive to changes in her environment. In January 2014, a behavioral health specialist reported that the child had nightly episodes of crying and screaming in her sleep, that she screamed and refused to visit with the parents, she clung to the foster parents during social worker visits, and she made statements that she did not want contact with the parents. The child had difficulty separating from the foster parents when she was left at preschool, and she had a fear of being abandoned there. Similarly, in May 2014, a SART treatment progress report stated that visits with the parents were detrimental to the child, as evidenced by her behavior after visits. She had difficulty sleeping, a loss of appetite, nightmares, crying, she was clingy with the foster parents, and she became anxious when left alone.

The evidence also showed that the child was diagnosed with Anxiety Disorder Not Otherwise Specified, and that her therapist reported seeing an increase in the child's stress since visits resumed. The child constantly told her therapist she did not want to go to the visits. The therapist noticed a difference in the child's demeanor after visits with the parents—specifically, that she "disengaged and [became] unfocused." The therapist also reported that the child began using masturbation as a form of self-soothing. By December 2014, the child was still having difficulty with the visits and repeatedly told her foster father she did not want to see the parents.

15

Furthermore, the evidence showed that the child was very attached to her foster parents/prospective adoptive parents. She identified them as her parents. In contrast, she did not consider mother and father as her parents, but rather saw them as playmates. The child referred to the parents as "[t]hat boy and girl" and "those people."

At the 18-month review hearing, the social worker testified that the child would not adjust well if she were to be sent home to live with the parents at that time. In light of her anxiety and tension from visits, he opined that it would be very traumatic for her. Noting that the parents were still having supervised visits, he stated that the child needed more time to get used to being alone with the parents. He opined that it would take a lot of time for her to feel safe and comfortable with them. Unfortunately, at that point in the proceedings, the court had to either return the child to the parents, or terminate services and proceed to devising a permanent plan for her. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788.) Since there was substantial evidence showing how the child reacted negatively to mere *visits* with the parents, it was reasonable for the court to conclude that returning the child to their *custody* would be detrimental to her emotional well-being. (§ 366.22, subd. (a).)

Father claims that the evidence was insufficient because there were no psychological evaluations or opinions from the child's therapists that the child was at risk of suffering emotional harm if returned to the parents. In support of his claim, he relies on cases such as *Blanca P. v. Superior Court of Orange County* (1996) 45 Cal.App.4th 1738, *In re Jasmon O.* (1994) 8 Cal.4th 398, and *In re Brian R*. (1991) 2 Cal.App.4th 904. While these cases demonstrate that psychological evaluations *can* serve as evidence

16

to sustain a detriment finding, they do not hold that psychological evaluations or opinions are *required* to establish detriment.  (*Blanca P.*, at p. 1750; *Brian R.*, at pp. 918-919, *Jasmon O.*, at pp. 416-417.)  In any event, the child was diagnosed at Infinity Pediatrics with PTSD, and a nurse practitioner stated that it was brought on by the child's "biological dysfunctional family unit."  The nurse practitioner further stated that the child's abdominal pains and severe anxiety attacks were caused by visits with the parents.  Moreover, contrary to father's claim, there was plenty of evidence from the child's therapist, including her report that visits with the parents were detrimental to the child, since they produced a loss of appetite, difficulty sleeping, nightmares, crying, anxiety when left alone, and made her clingy with the foster parents.

Furthermore, father's claim that the evidence was insufficient since the emotional harm the child was at risk of suffering was "not serious long term emotional damage" is unsupported.  Father cites *In re Jasmon O.*, *supra*, 8 Cal.4th at page 421, as follows:  "'At the conclusion of (the 18-month period) . . . the parent's right to reunification may be outweighed by the child's interest in stability.  At this point, evidence that disruption of the bond with foster parents will cause the child serious, long-term emotional damage may be crucial in ascertaining the best interests of the child.'"  The court simply stated that evidence that disruption of the bond with the foster parents will cause long-term emotional damage may be important in ascertaining the best interests of the child.  It certainly did not hold that evidence of serious long-term emotional damage is required to show detriment.

In sum, by the time of the 18-month hearing, the juvenile court had to order the return of the child to the parents, unless it found, *by a preponderance of the evidence*, that such return would create a substantial risk of detriment to the child. (§ 366.22, subd. (a).) The evidence of detriment here was sufficient. Thus, we cannot say that the court exercised its discretion in an arbitrary or capricious manner in terminating services and setting a section 366.26 hearing. (*Constance K.*, *supra*, 61 Cal.App.4th at p. 705.)

DISPOSITION

The writ petitions are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST          
J.

We concur:


RAMIREZ          
    P. J.


CODRINGTON          
    J.